## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————————————————————— )
 )
SHELL OIL COMPANY, )
ATLANTIC RICHFIELD COMPANY, )
TEXACO INC., )
AND UNION OIL COMPANY OF CALIFORNIA )
 )
Plaintiffs, )
 )        No. 1:19-cv-01795-CFL
v. )        Hon. Charles F. Lettow
 )
THE UNITED STATES OF AMERICA, )
 )
Defendant. )
———————————————————————— )

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

Date: November 25, 2019

Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
mkirk@cooperkirk.com

*Of Counsel*:
Vincent J. Colatriano
J. Joel Alicea
Cooper & Kirk PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

APPENDIX TABLE OF CONTENTS ............................................................................. v

QUESTIONS PRESENTED ............................................................................................ 1

INTRODUCTION ........................................................................................................... 1

STATEMENT .................................................................................................................. 3

    I.      The Avgas Contracts and the Disposal of Acid Waste ............................... 3

    II.     The CERCLA Litigation ............................................................................. 6

    III.    Proceedings in the Federal Circuit and the Court of Federal Claims ........ 7

    IV.    Damages Claimed in This Litigation .......................................................... 8

ARGUMENT .................................................................................................................. 11

    I.      The Oil Companies Are Entitled to Summary Judgment on Liability
          Because the Federal Circuit Has Already Held That the Government
          Is Liable for Any CERCLA Response Costs the Oil Companies Incur
          By Reason of the Production of Avgas ...................................................... 13

    II.     The Oil Companies Are Entitled to Summary Judgment on Damages
          Because the Federal Circuit Has Already Held That All of the Oil
          Companies' CERCLA Response Costs Were Incurred By Reason
          of the Production of Avgas ........................................................................ 14

    III.    The Government's Insurance-Offset Defense Fails as a Matter of Law. .... 16

          A.  The Federal Circuit Previously Rejected the Government's
               Insurance-Offset Defense ................................................................... 17

          B.  The Insurance-Offset Defense Is Barred by *Res Judicata* .................... 19

          C.  The Insurance-Offset Defense Is Barred by the Remote-Transaction Rule ......... 21

          D.  The Insurance-Offset Defense Is Barred by the Collateral-Source Rule ............ 27

CONCLUSION ............................................................................................................... 36

STATUTORY ADDENDUM .......................................................................................... 38

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page**

*Adams v. Mills*, 286 U.S. 397 (1932) ..........................................................................24

*ADM Investor Services., Inc. v. Collins*, 515 F.3d 753 (7th Cir. 2008)........................28

*Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461 (2004)..............................13

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) .............................14

*B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293 (2015) ....................13, 14

*Brown v. Felsen*, 442 U.S. 127 (1979) ...........................................................................19

*Container Co. v. United States*, 90 F. Supp. 689 (Ct. Cl. 1950) .............................32, 33

*Cromwell v. Sac Cty.*, 4 Otto (94 U.S.) 351 (1876) ...........................................12, 19, 20, 21

*Crosson v. N. V. Stoomvaart Mij "Nederland"*, 409 F.2d 865 (2d Cir. 1969)...........................32

*Dominion Res., Inc. v. Alstom Power, Inc.*, 825 S.E.2d 752 (Va. 2019) .............28, 30, 33, 34, 36

*Duke Energy Progress, Inc. v. United States*, 135 Fed. Cl. 279 (2017) ....................23, 24

*F.B. Leopold Co. v. Roberts Filter Manufacturing Co.*, 1997 WL 378004,
119 F.3d 15 (Fed. Cir. 1997) (unpublished opinion) ......................................................31

*Foster v. Hallco Mfg. Co.*, 947 F.2d 469 (Fed. Cir. 1991) ...................................20, 20

*Hall v. Miller*, 465 A.2d 222 (Vt. 1983) ........................................................................28

*Hallco Manufacturing Co. v. Foster*, 256 F.3d 1290 (Fed. Cir. 2001).................19, 20

*Heiser v. Woodruff*, 327 U.S. 726 (1946) ......................................................................19

*Helfend v. Southern Cal. Rapid Transit Dist.*, 465 P.2d 61 (Cal. 1970) ...............30, 35

*Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001) ...................23

*Hughes Commc'ns Galaxy, Inc. v. United States*, 38 Fed. Cl. 578 (1997) ...........22, 32

*Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360 (Fed. Cir. 2000) ...............................14

*John Munic Enters., Inc. v. Laos*, 326 P.3d 279 (Ariz. Ct. App. 2014) .............24, 28, 35

*Kansas City Power & Light Co. v. United States*, 143 Fed. Cl. 134 (2019)...................33

*Kansas Gas & Elec. Co. v. United States*, 685 F.3d 1361 (Fed. Cir. 2012) ................29

*LaSalle Talman Bank, F.S.B. v. United States*,
317 F.3d 1363 (Fed. Cir. 2003) ...............................12, 23, 24, 27, 28, 29, 34, 36

*Lesmark, Inc. v. Pryce*, 334 F.2d 942 (D.C. Cir. 1964)................................................32

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367 (Fed. Cir. 2013) ........20

*Maine Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372 (1999) ................23

*North Cent. Airlines, Inc. v. City of Aberdeen, S. D.*, 370 F.2d 129 (8th Cir. 1966)....................32

*Sacramento Mun. Util. Dist. v. United States*, 566 F. App'x 985 (Fed. Cir. 2014)................33, 34

*Safway Rental & Sales Co. v. Albina Engine & Mach. Works, Inc.,*
   343 F.2d 129 (10th Cir. 1965) ................................................................32

*Shelden v. United States*, 34 Fed. Cl. 355 (1995) ................................27, 28

*Shell Oil Co. v. United States*, 896 F.3d 1299
   (Fed. Cir. 2018)......................1, 3, 4, 5, 6, 8, 9, 11, 12, 14, 15, 16, 17, 18, 20, 27

*Shell Oil Co. v. United States*, 130 Fed. Cl. 8 (2017) ........................3, 5, 6, 8, 9, 10, 15

*Shell Oil Co. v. United States*, 123 Fed. Cl. 707 (2015) ................................18

*Shell Oil Co. v. United States*, 751 F.3d 1282 (Fed. Cir. 2014)..........1, 3, 4, 5, 7, 8, 11, 13, 15, 17

*Shell Oil Co. v. United States*, 108 Fed. Cl. 422 (2013) ................................7

*Shell Oil Co. v. United States*, 672 F.3d 1283 (Fed. Cir. 2012)................................7

*Shell Oil Co. v. United States*, 86 Fed. Cl. 470 (2009) ................................7

*Shell Oil Co. v. United States*, 80 Fed. Cl. 411 (2008) ................................7

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 15 Cal. Rptr. 2d 815 (Ct. App. 1993) ................34

*Southern Pacific Co. v. Darnell-Taenzer Lumber Co.,*
   245 U.S. 531 (1918) ................................12, 21, 22, 27, 36

*Spurr v. LaSalle Const. Co.*, 385 F.2d 322 (7th Cir. 1967) ................................32

*S.W. Aircraft Inc. v. United States*, 551 F.2d 1208 (Ct. Cl. 1977) ................................33

*Sweet v. United States* 63 Fed. Cl. 591 (2005) ................................12, 31, 32

*Technical Computer Servs., Inc. v. Buckley*, 844 P.2d 1249 (Colo. App. 1992)................28

*Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 580 F.2d 1222 (4th Cir. 1978) ................32

*United States v. Shanbaum*, 10 F.3d 305 (5th Cir. 1994) ................................21

*United States v. Shell Oil Co.*, 294 F.3d 1045 (9th Cir. 2002) ................................6, 7

*United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018 (C.D. Cal. 1998) ................................6

*Wisconsin Elec. Power Co. v. United States*, 90 Fed. Cl. 714 (2009) ................................23

## Statutes

28 U.S.C. § 1491(a) ................................................................10

41 U.S.C.
   § 106(f) (2010)................................9, 10, 15, 16
   § 113(a) (2010) ................................10
   § 113(c)(2) (2010) ................................10

## Other Authorities

3 DAN B. DOBBS, DOBBS LAW OF REMEDIES:  DAMAGES-EQUITY-RESTITUTION
   § 12.6(4) (2d ed. 1993) ......................................................................................34

John G. Fleming, *The Collateral Source Rule and Contract Damages*,
   71 CALIF. L. REV. 56 (1983) .............................................................................30

Joseph M. Perillo, *The Collateral Source Rule in Contract Cases*,
   46 SAN DIEGO L. REV. 705 (2009) ..............................................................30, 35

RESTATEMENT (SECOND) OF JUDGMENTS § 18 (1982) ......................................11, 12, 19

iv

## APPENDIX TABLE OF CONTENTS

**Page**

Declaration of Michael W. Kirk ...........................................................................A 001

PX1, Contract Between Defense Supplies Corporation and Shell Oil Company, Inc.
(Apr. 10, 1942).........................................................................................A 004

PX2, Contract Between Defense Supplies Corporation and Shell Oil Company, Inc.
(May 1, 1943)...........................................................................................A 028

PX3, Contract Between Defense Supplies Corporation and Union Oil Company
(Dec. 31, 1942) ........................................................................................A 057

PX4, Contract Between Defense Supplies Corporation and Union Oil Company of
California (May 1, 1943) ..........................................................................A 071

PX5, Contract Between Defense Supplies Corporation and Richfield Oil Corporation
(Feb. 3, 1942)...........................................................................................A 102

PX6, Contract Between Defense Supplies Corporation and Richfield Oil Corporation
(Feb. 20, 1943).........................................................................................A 120

PX7, Contract Between Defense Supplies Corporation and The Texas Company
(Jan. 17, 1942).........................................................................................A 152

PX8, Contract Between Defense Supplies Corporation and The Texas Company
(Feb. 8, 1943)...........................................................................................A 167

PX9, Demand Letter from M. Kirk to Emily W. Murphy, General Services Administrator
re Claims on World War II Aviation Gasoline Contracts (Jul. 29, 2019) ..................A 195

Declaration of Edmond F. Bourke ......................................................................A 204

PX10, Total Costs Incurred, with Interest, From Dec. 1, 2015 Through Sept. 30, 2019 ........A 209

PX11, Interest on Pre-October 31, 1998 Costs Incurred ......................................A 210

PX12, C2 REM Costs Incurred from Dec. 1, 2015 Through Sept. 30, 2019..........................A 211

PX13, Interest on C2 REM Costs Incurred From Dec. 1, 2015 Through Sept. 30, 2019 .......A 212

PX14, New Interest on C2 REM Costs Incurred Before Dec. 1, 2015 ...................................A 213

PX15, McAuley Costs Incurred From Dec.1, 2015 Through Sept. 30, 2019.........................A 214

PX16, Interest on McAuley Costs Incurred From Dec. 1, 2015 Through Sept. 30, 2019 ....... A 215

PX17, New Interest on Accrued McAuley Costs Paid Before Dec. 1, 2015 .......................... A 216

Declaration of Michael Formoso ........................................................................................... A 217

Declaration of Cynthia D. Kezos ......................................................................................... A 220

Declaration of William E. Platt ............................................................................................ A 225

## QUESTIONS PRESENTED

1.      Under the United States Court of Appeals for the Federal Circuit's holding that "[t]he plain language of the new or additional charges provision thus requires the Government to indemnify the Oil Companies for CERCLA costs incurred 'by reason of' the avgas contracts," *Shell Oil Co. v. United States*, 751 F.3d 1282, 1293 (Fed. Cir. 2014) ("*Fed. Cir. Liability Decision*"), is the Government liable for CERCLA costs and interest incurred by the Oil Companies " 'by reason of' the avgas contracts" on or after December 1, 2015?

2.      Under the Federal Circuit's holding that "*all* costs of waste remediation at the McColl site were attributable to the Avgas Contracts," *Shell Oil Co. v. United States*, 896 F.3d 1299, 1311 (Fed. Cir. 2018) ("*Fed. Cir. Damages Decision*") (emphasis added), is the Government required to pay all CERCLA costs and interest incurred by the Oil Companies on or after December 1, 2015?

3.      Under the Federal Circuit's holding that "the Government waived all arguments related to insurance settlement payments," *Fed. Cir. Damages Decision*, 896 F.3d at 1316, is the Government's insurance-offset defense barred by (a) *res judicata*, (b) the remote-transaction rule, and/or (c) the collateral-source rule?

## INTRODUCTION

When the United States declared war on the Axis Powers in December 1941, it was immediately confronted with the task of producing sufficient aviation gasoline to wage war across the globe. To meet this urgent necessity, the Federal Government called upon the American petroleum industry, entering into contracts with, among others, Shell Oil Company, Atlantic Richfield Company, Texaco Inc., and Union Oil Company of California (the "Oil Companies") to produce maximum quantities of aviation gasoline (avgas). In exchange, the Government

guaranteed that it would indemnify the Oil Companies for any new charges that Federal law might require them to pay in the future by reason of the production of avgas. Decades later, after the Oil Companies were required by Federal law to pay the cost of cleaning up the McColl Superfund Site based on waste generated by avgas production, the Oil Companies asked the United States to honor its promise and reimburse them for these remediation costs, which they had incurred by reason of the production of avgas. The United States refused.

After nearly three decades of litigation during which three different trial judges held that the United States was liable for 100 percent of the cost of cleaning up the McColl Site, a unanimous panel of the Federal Circuit definitively held in 2018 that the Government must live up to its contractual obligation to indemnify the Oil Companies for *all* costs that they have incurred remediating the Site. The Federal Circuit's decision was its *third* opinion regarding the McColl Site, and it followed a full-scale trial on damages. Pursuant to the judgment affirmed by the Federal Circuit, the Government reimbursed the Oil Companies almost $100 million on April 1, 2019, covering the costs and interest owed to the Oil Companies through November 30, 2015.

The Oil Companies then requested reimbursement of the costs and interest that they have incurred since November 30, 2015. But notwithstanding the prior judgment of this Court and the Federal Circuit's clear liability and damages decisions, the Government again refused to indemnify the Oil Companies for the costs and interest that they had incurred remediating the McColl Site or to take responsibility for future costs at the Site. Relying on an affirmative defense that this Court and the Federal Circuit rejected as untimely and prejudicial during the previous round of litigation, the Government has forced the Oil Companies to come back to this Court and seek yet another judgment holding the Government responsible for the costs and interest that the Oil Companies incurred at the McColl Site. But unlike the prior lawsuit, this one requires no significant work on

the part of this Court: the Federal Circuit has already resolved this case in favor of the Oil Companies, and this Court need only enter judgment in their favor. This Court should grant the Oil Companies' Motion for Summary Judgment and bring the McColl Site litigation to a final and decisive end.

## STATEMENT

### I.      The Avgas Contracts and the Disposal of Acid Waste

In the aftermath of the attack on Pearl Harbor on December 7, 1941, aviation gasoline became "the most critically needed refinery product during World War II." *Fed. Cir. Damages Decision*, 896 F.3d at 1303. "[T]he Government recognized the need to quickly mobilize avgas production . . . stating: 'It is *essential,* in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum.*' " *Fed. Cir. Liability Decision*, 751 F.3d at 1286 (emphases in original). Accordingly, the Government, through its wholly-owned Defense Supplies Corporation (DSC), entered into contracts with the Oil Companies in 1942 and 1943 to produce avgas for the global war effort (the "Avgas Contracts"). *Id.* As relevant here, the Avgas Contracts pertained to the Oil Companies' Los Angeles-based refineries: Shell's Wilmington and Dominguez refineries, Atlantic Richfield's Watson refinery, Texaco's Wilmington refinery, and Union's Wilmington refinery. *Shell Oil Company v. United States*, 130 Fed. Cl. 8, 13–14 nn.4–7 (2017) ("*CFC Damages Decision*").

The bargain that the United States made with the Oil Companies was straightforward. The Oil Companies "agree[d] to sell vast quantities of avgas" to the Government and "expand avgas production facilities" "as quickly as possible" to accomplish that goal, all while being limited to a specified profit of 6–7 percent. *Fed. Cir. Liability Decision*, 751 F.3d at 1286 & n.3; *Fed. Cir. Damages Decision*, 896 F.3d at 1303. "The Oil Companies agreed to the avgas contracts' low

profits in return for the Government's assumption of certain risks outside of the Oil Companies' control." *Fed. Cir. Liability Decision*, 751 F.3d at 1296. Specifically, each of the Avgas Contracts contained the following indemnification provision:

> <u>Buyer shall pay[,] in addition to the prices as established in [earlier provisions of the contract], any new or additional</u> taxes, fees, or <u>charges</u>, other than income, excess profits, or corporate franchise taxes, <u>which Seller may be required by any</u> municipal, state, or <u>federal law</u> in the United States or any foreign country <u>to</u> collect or <u>pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder</u>.

*See, e.g.*, PX1, Contract Between Defense Supplies Corporation and Shell Oil Company, Inc. (Apr. 10, 1942), § XII(a) (A019) (emphases added).[1] The "commodit[y] delivered" under the contracts was avgas.

"The Oil Companies held up their end of the bargain: avgas production increased over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, and was crucial to Allied success in the war." *Fed. Cir. Liability Decision*, 751 F.3d at 1287. However, the production of avgas generated two waste products relevant here: spent alkylation acid and acid sludge, which the Federal Circuit has referred to collectively as "acid waste." *Id.* at 1288. Avgas production required a process called alkylation, a chemical reaction that uses 98 percent pure sulfuric acid as a catalyst. *Fed. Cir. Damages Decision*, 896 F.3d at 1303. The result of this reaction was a waste product called "spent alkylation acid," a diluted form of sulfuric acid that could no longer be used in the alkylation process. *Id.* "Predictably, the Oil Companies' success in increasing avgas production resulted in a corresponding increase in sulfuric acid consumption, which increased five-fold from 1941 to 1944." *Fed. Cir. Liability Decision*, 751

---

[1] All declarations and exhibits cited herein are contained in the attached Appendix to Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment. Page citations are to the consecutive pagination of the Appendix.

F.3d at 1288. The Oil Companies had three options for managing these vast quantities of spent alkylation acid: (1) reprocess it back to 98 percent purity via off-site reprocessing facilities; (2) use it to purify or "acid treat" various refinery products, such as kerosene; or (3) dispose of it. *Id.* The Oil Companies reprocessed as much spent alkylation acid as they could, but "[f]acilities to reprocess the spent alkylation acid did not increase apace" with the amount of spent alkylation acid generated by avgas production. *Id.* The Oil Companies therefore "used as much spent alkylation acid as possible to acid treat non-avgas petroleum by-products." *CFC Damages Decision*, 130 Fed. Cl. at 23; *see also Fed. Cir. Damages Decision*, 896 F.3d at 1304; *Fed. Cir. Liability Decision*, 751 F.3d at 1288.

The acid-treatment process resulted in an even more diluted waste product called "acid sludge," which could be "(1) used to manufacture fertilizer; (2) burned; or (3) disposed." *Fed. Cir. Damages Decision*, 896 F.3d at 1304; *Fed. Cir. Liability Decision*, 751 F.3d at 1288. The Oil Companies "tried to reprocess[ ] as much acid sludge into [non-waste] fertilizer as possible, but were stymied in their ability to do so because of the Government's refusal to allocate rail cars to transport the acid sludge to reprocessing facilities" in Northern California. *Fed. Cir. Damages Decision*, 896 F.3d at 1310 (citation and quotation marks omitted); *Fed. Cir. Liability Decision*, 751 F.3d at 1288. Burning acid sludge "caused the emission of sulfur dioxide and odorous fumes," and "it was an inefficient fuel." *CFC Damages Decision*, 130 Fed. Cl. at 25. Thus, "[u]nable to reprocess the increased amount of spent alkylation acid given the Government's prioritization of production over reprocessing," *Fed. Cir. Damages Decision*, 896 F.3d at 1304, and "unable to transport acid sludge for reprocessing or other uses," *Fed. Cir. Liability Decision*, 751 F.3d at 1288, "the Oil Companies dumped additional spent alkylation acid, along with acid sludge, on

property in California owned by Eli McColl ('the McColl site')," *Fed. Cir. Damages Decision*, 896 F.3d at 1304.

The McColl Site consists of two parcels of land located in Fullerton, California. *CFC Damages Decision*, 130 Fed. Cl. at 14, 30. Each parcel contains six pits or sumps into which the Oil Companies dumped acid waste beginning in June 1942. *Id.* After the Allied victory in World War II, the United States terminated the Avgas Contracts, *see Fed Cir. Liability Decision* at 1288, and "avgas production plummeted in 1946 to pre-Contract levels," *Fed. Cir. Damages Decision*, 896 F.3d at 1308 (emphasis omitted). As a result, the amount of spent alkylation acid generated by the refineries also plummeted, and "the Oil Companies did not dump any spent alkylation acid or acid sludge at the McColl site" in 1946. *Id.*; *CFC Damages Decision*, 130 Fed. Cl. at 36. The McColl Site closed on September 6, 1946. *Fed. Cir. Damages Decision*, 896 F.3d at 1304.

## II.     The CERCLA Litigation

In 1991, 45 years after the closure of the McColl Site, the United States and California sued the Oil Companies under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), alleging that the Oil Companies were responsible for the release of hazardous substances at the McColl Site. The Oil Companies counterclaimed for breach of contract, arguing that the United States was responsible for the cleanup costs at the McColl Site pursuant to the indemnification provision of the Avgas Contracts because all waste at the Site was generated and dumped by reason of the production of avgas. The district court held that both the Oil Companies and the United States were liable as "arrangers" under CERCLA, *see United States v. Shell Oil Co.*, 294 F.3d 1045, 1048 (9th Cir. 2002), and, after a trial, it also held that the United States was responsible for 100 percent of the costs of cleaning up the waste at the McColl Site, *see United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1019, 1030 (C.D. Cal. 1998).

The United States Court of Appeals for the Ninth Circuit affirmed the district court's conclusion that the United States was liable for 100 percent of the cleanup costs of the benzol waste deposited at the Site (which was about 5.5 percent of the waste), but it reversed the holding that the United States was liable under CERCLA as an "arranger" for the cost of cleaning up the non-benzol sulfuric acid waste at the Site. *See Shell Oil Co.*, 294 F.3d at 1049. In accordance with the Ninth Circuit's holding on "arranger" liability, the Oil Companies have borne the bulk of the cost of cleaning up the acid waste since 1994.

## III.    Proceedings in the Federal Circuit and the Court of Federal Claims

The district court transferred the Oil Companies' breach-of-contract counterclaim to this Court. The Oil Companies thereafter voluntarily dismissed their counterclaim without prejudice so that they could exhaust their administrative remedies, and then filed a complaint in this Court for breach of contract. In 2008, the Court granted summary judgment to the Oil Companies, holding that the United States was liable under the Avgas Contracts for 100 percent of the cleanup costs at the McColl Site. *See Shell Oil Co. v. United States*, 86 Fed. Cl. 470 (2009); *Shell Oil Co. v. United States*, 80 Fed. Cl. 411, 420 (2008). The Federal Circuit later vacated that judgment because the judge to which the case had been assigned had a financial conflict of interest (stemming from his wife's ownership of a small amount of stock in the current parent of two of the Oil Companies) of which he had been unaware when he granted summary judgment. *See Shell Oil Co. v. United States*, 672 F.3d 1283, 1290–91 (Fed. Cir. 2012).

The case was reassigned on remand, and this Court granted summary judgment to the United States on liability in 2013. *See Shell Oil Co. v. United States*, 108 Fed. Cl. 422, 448 (2013). The Federal Circuit reversed, holding that "[t]he plain language of the new or additional charges provision thus requires the Government to indemnify the Oil Companies for CERCLA costs

incurred 'by reason of' the avgas contracts." *Fed. Cir. Liability Decision*, 751 F.3d at 1293. The Federal Circuit remanded "for the Court of Federal Claims to determine how much acid waste at the McColl site was 'by reason of' the avgas contracts." *Id.* at 1303.

On remand, this Court held a trial on damages in early 2016, in accordance with the Federal Circuit's mandate. The Court found that "*all* of the acid waste disposed of at the McColl Site was 'by reason of' the Avgas Contracts" and awarded the Oil Companies $99,509,847.32 in damages. *CFC Damages Decision*, 130 Fed. Cl. at 42 (emphasis added). This represented 100 percent of the costs that the Oil Companies had incurred at the McColl Site through November 30, 2015, plus the statutory interest on those costs that had accrued up to that point in time.[2]

On July 18, 2018, the Federal Circuit unanimously affirmed this Court's judgment. *Fed. Cir. Damages Decision*, 896 F.3d at 1314. The United States chose not to seek rehearing or rehearing *en banc*; nor did it petition the United States Supreme Court for a writ of *certiorari*. The judgment in favor of the Oil Companies therefore became final, and the United States paid the Oil Companies on April 1, 2019, in accordance with the judgment. Kirk Decl. ¶ 6 (A003).

## IV.   Damages Claimed in This Litigation

Because the remediation of the McColl Site remains ongoing, the Oil Companies have continued to incur costs remediating the Site since November 30, 2015, the end of the period addressed in the 2016 damages trial. Through September 30, 2019, those costs amount to $1,543,840.68 paid to C2 REM, the contractor charged with maintaining the remedy at the Site, and $69,300.00 to McAuley LCX Corp., the contractor that provides security at the Site. Bourke Decl. ¶¶ 9(c), 9(f), 10 (A206–07); PX12 (A211), PX15 (A214).

---

[2] As explained below, the Contract Settlement Act provides for 2.5 percent simple interest on the costs the Oil Companies incur remediating the McColl Site.

In addition, under the terms of the Contract Settlement Act:

> Each contracting agency shall allow and pay interest on the amount due and unpaid from time to time on any termination claim under a prime contract at the rate of 2½ per centum per annum for the period beginning thirty days after the date fixed for termination *and ending with the date of final payment* . . . .

41 U.S.C. § 106(f) (2010) (emphasis added) (repealed 2011).[3] Interest continues to accrue on the costs the Oil Companies incurred after November 30, 2015. Through September 30, 2019, the interest amounts to $72,812.66 on the C2 REM costs and $3,351.08 on the McAuley costs. Bourke Decl. ¶¶ 9(d), 9(g), 11 (A206–07); PX13 (A212); PX16 (A215). This interest will continue to accrue until final payment is made on the costs incurred after November 30, 2015.

In addition, as noted above, on April 1, 2019, the United States paid all costs the Oil Companies incurred through November 30, 2015, including $64,219,514.46 that the Oil Companies incurred through October 31, 1998, and costs paid to C2 REM and McAuley from 2002 through November 30, 2015. The United States also paid the interest that had accrued on those costs through November 30, 2015. *CFC Damages Decision*, 130 Fed. Cl. at 38–42. However, that payment did not cover the interest that accrued on those pre-December 1, 2015 costs between

---

[3] As this Court explained and held in the last case:

> In 2011, the CSA was repealed and replaced by An Act To Enact Certain Laws Relating To Public Contracts, Pub. L. 111–350, 124 Stat. 3677. The 2011 Act contained a savings clause providing that, "[t]he laws . . . are repealed except for *rights and duties that matured,* penalties that were incurred, and proceedings that were begun before the date of enactment of this Act." Pub. L. No. 111–350, § 7(b), 124 Stat. 3677, 3855 (2011) (emphasis added). Consequently, the Oil Companies may still recover for interest on the environmental remediation costs they have incurred, as the Oil Companies['] right to be reimbursed for environmental remediation costs under the Avgas Contracts matured prior to 2011.

*CFC Damages Decision*, 130 Fed. Cl. at 39 n.42. The Federal Circuit affirmed this Court's award of interest to the Oil Companies. *Fed. Cir. Damages Decision*, 896 F.3d at 1306, 1316. Accordingly, all references herein to the CSA are from the 2010 edition of the United States Code.

December 1, 2015 and March 31, 2019 (i.e., the day before the United States made payment). Because interest continued to accrue on these costs until "the date of final payment," 41 U.S.C. § 106(f), the Oil Companies are entitled to reimbursement of interest covering this period in the following amounts:

- Interest on Costs Incurred through Oct. 31, 1998: $5,351,626.40

- Interest on C2REM Costs Incurred from 2002 through Nov. 30, 2015: $336,910.77

- Interest on McAuley Costs Incurred from 2002 through Nov. 30, 2015: $21,455.88

Bourke Decl. ¶¶ 9(b), 9(e), 9(h), 12 (A206–07); PX11 (A210); PX14 (A213); PX17 (A216).

In total, through September 30, 2019, the Oil Companies have incurred $7,399,297.46 in costs and interest owed to them by the United States in accordance with the Avgas Contracts and Section 6(f) of the CSA. Bourke Decl. ¶¶ 9(a), 14 (A205, A207); PX10 (A209). These costs were paid by the Oil Companies in accordance with the following allocation:

| Oil Company | Percentage of Costs and Interest |
|---|---|
| Shell Oil Company | 58.58% |
| Union Oil Company of California | 18.94% |
| Atlantic Richfield | 18.94% |
| Texaco Inc. | 3.54% |

Bourke Decl. ¶ 15 (A208); *see also CFC Damages Decision*, 130 Fed. Cl. at 42, 83–86.

In accordance with Section 13(a) of the CSA, *see* 41 U.S.C. § 113(a), the Oil Companies submitted a formal demand for these costs and interest, and for a decision and written findings, to the General Services Administration, the successor-in-interest to the DSC, on July 29, 2019. *See* PX9 (A195–203). The GSA has not responded to this demand. The Oil Companies now bring this suit pursuant to Section 13(c)(2) of the CSA, *see* 41 U.S.C. § 113(c)(2) ("A war contractor may initiate proceedings . . . (iii) in case of failure to deliver such findings, within one year after his demand therefor."), and pursuant to the Tucker Act, *see* 28 U.S.C. § 1491(a).

10

## ARGUMENT

Although the history of this case is extensive, the issues before the Court in *this* round of litigation are not complicated. The Federal Circuit has already squarely held that the Government is liable for reimbursing the Oil Companies for the CERCLA remediation costs that they incur at the McColl Site by reason of the production of avgas, *see Fed. Cir. Liability Decision*, 751 F.3d at 1293, and it has also squarely held that *all* CERCLA remediation costs at the McColl Site were incurred by reason of the production of avgas, *Fed. Cir. Damages Decision*, 896 F.3d at 1311. Thus, as a matter of both binding Circuit precedent and issue preclusion, the United States must pay all CERCLA remediation costs that the Oil Companies incur at the McColl Site. The Bourke Declaration, filed herewith, documents the McColl Site costs (and the statutory interest on those costs) incurred by the Oil Companies since November 30, 2015, and there is no genuine issue of material fact as to whether these costs were in fact incurred and paid by the Oil Companies. Accordingly, the Oil Companies are entitled to summary judgment on both liability and damages.

By all rights, no more would need to be said, and this case would be over before it begins. But the Government has made clear to the Oil Companies that it intends to assert an affirmative defense that it tried to raise—and that both this Court and the Federal Circuit rejected as untimely—in the last lawsuit. That affirmative defense seeks to offset the Oil Companies' damages by the amount of insurance proceeds that the Oil Companies allegedly recovered from their insurers during the 1990s. But the Government's insurance-offset defense fails as a matter of law for three independent reasons.

*First*, because the Government could have—but did not—timely raise its offset defense in the last case, the defense is barred by *res judicata* (defense preclusion). "When a valid and final personal judgment is rendered in favor of the plaintiff . . . the defendant cannot avail himself of

11

defenses he might have interposed, or did interpose, in the first action." RESTATEMENT (SECOND) OF JUDGMENTS § 18 (1982); *Cromwell v. Sac Cty.*, 4 Otto. (94 U.S.) 351, 352–53 (1876). Regardless of the merits of the Government's offset defense, it is precluded by the judgment entered in the last lawsuit.

*Second*, the Government's offset defense is barred by the remote-transaction rule, which holds that, where the victim of a breach passes on a portion of his damages to another party in a transaction not directly caused by the breach, the transaction will not be considered in the calculation of damages owed by the breaching party. *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533–34 (1918). Supreme Court precedent makes clear that insurance is a classic example of a remote transaction that is irrelevant to the calculation of damages, *id.* at 534, and the Government's insurance-offset defense must fail as a matter of law.

*Third*, the Government's offset defense is barred by the collateral-source rule, which holds that "collateral benefits received by the injured party do not reduce the damages owed by the wrongdoer." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1372 (Fed. Cir. 2003). Insurance is a paradigmatic example of a collateral source that is irrelevant to the calculation of damages, *see Sweet v. United States*, 63 Fed. Cl. 591, 595, 598 (2005), and so the Government's insurance-offset defense fails as a matter of law.

The long and the short of it is this: what the Federal Circuit held last year remains true this year. Because "all costs of waste remediation at the McColl site [a]re attributable to the Avgas Contracts," *Fed. Cir. Damages Decision*, 896 F.3d at 1311, the United States must indemnify the Oil Companies for 100 percent of the costs and interest they have incurred at the McColl Site since November 30, 2015. The Oil Companies are entitled to summary judgment.

I.      **The Oil Companies Are Entitled to Summary Judgment on Liability Because the Federal Circuit Has Already Held That the Government Is Liable for Any CERCLA Response Costs the Oil Companies Incur By Reason of the Production of Avgas.**

The Avgas Contracts require the Government to indemnify the Oil Companies for "any new or additional . . . charges . . . which [the Oil Companies] may be required by any . . . federal law in the United States . . . [to] pay by reason of the production, manufacture, sale or delivery of [avgas]." Thus, in assessing whether the Government is liable for breaching the Avgas Contracts, "[t]he proper question is whether the avgas contracts require the Government to pay the Oil Companies' CERCLA charges." *Fed. Cir. Liability Decision*, 751 F.3d at 1294. In 2014, the Federal Circuit squarely held that the answer is "yes":

> Contrary to the Government's arguments, CERCLA costs are "charges" within the meaning of the relevant contract provision . . . . The plain language of the new or additional charges provision thus requires the Government to indemnify the Oil Companies for CERCLA costs incurred "by reason of" the avgas contracts.

*Id.* at 1292–93. The Federal Circuit rejected the Government's arguments that CERCLA response costs were not "charges" within the meaning of the indemnification provision, *id.* at 1290–96; that the Oil Companies had released their contract claims, *id.* at 1296–99; and that the Anti-Deficiency Act barred the Oil Companies' breach claims, *id.* at 1299–1302. Accordingly, the Federal Circuit held that it was "appropriate to enter summary judgment in favor of the Oil Companies with respect to breach of contract liability," *id* at 1302, and it "remand[ed] for a trial on damages," *see id.* at 1303. Because this case involves the same contracts and the same parties at issue in the Federal Circuit's 2014 liability decision, and because the Government has again refused to indemnify the Oil Companies for their CERCLA response costs, the Oil Companies are entitled to summary judgment on liability.

"Preclusion principles . . . unquestionably do apply against the United States, its agencies and officers." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 490 n.14 (2004). "The

13

idea [behind issue preclusion] is straightforward: Once a court has decided an issue, it is forever settled as between the parties . . . ." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1302 (2015) (quotation marks omitted). In the Federal Circuit, issue preclusion applies when four factors are met: "(1) identity of the issues in a prior proceeding; (2) the issues were actually litigated; (3) the determination of the issues was necessary to the resulting judgment; and, (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365–66 (Fed. Cir. 2000).

All four factors are plainly met here: (1) the liability question—whether the Avgas Contracts require the Government to reimburse the Oil Companies for CERCLA response costs—is the same in this case as it was in the previous lawsuit between the parties; (2) the parties actually litigated liability for several years until the Federal Circuit resolved that issue in the Oil Companies' favor in 2014; (3) liability was necessary to the judgment in favor of the Oil Companies in the last case; and (4) the Government had every opportunity to litigate liability both in this Court and in the Federal Circuit. Because "a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise," *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991), the Oil Companies are entitled to summary judgment on liability.

## II.    The Oil Companies Are Entitled to Summary Judgment on Damages Because the Federal Circuit Has Already Held That All of the Oil Companies' CERCLA Response Costs Were Incurred By Reason of the Production of Avgas.

Because the Avgas Contracts require the Government to indemnify the Oil Companies for any CERCLA response costs that they incur "by reason of the production . . . of [avgas]," the assessment of damages turns on "the factual question of how much acid waste at the McColl site was attributable to the Avgas Contracts." *Fed. Cir. Damages Decision*, 896 F.3d at 1307 (quotation

14

marks omitted); *see also Fed. Cir. Liability Decision*, 751 F.3d at 1303. Once again, the Federal Circuit has already resolved this issue in favor of the Oil Companies. The Federal Circuit affirmed this Court's "determination that *all* costs of waste remediation at the McColl site were attributable to the Avgas Contracts." *Fed. Cir. Damages Decision*, 896 F.3d at 1311 (emphasis added); *see also CFC Damages Decision*, 130 Fed. Cl. at 42. Accordingly, the Federal Circuit affirmed this Court's award of 100 percent of the remediation costs incurred by the Oil Companies through November 30, 2015, including statutory interest of 2.5 percent under the Contract Settlement Act. *See Fed. Cir. Damages Decision*, 896 F.3d at 1316; *CFC Damages Decision*, 130 Fed. Cl. at 42.

That determination is dispositive here. The damages issue in this case—"how much acid waste at the McColl site was attributable to the Avgas Contracts," *Fed. Cir. Damages Decision*, 896 F.3d at 1307 (quotation marks omitted)—is identical to the damages issue in the previous lawsuit between the parties. That issue was actually litigated in a trial before this Court and on appeal to the Federal Circuit, and the resolution of that issue in favor of the Oil Companies was essential to the final judgment awarding the Oil Companies 100 percent of the response costs they had incurred through November 30, 2015. And, of course, the Government had a full and fair opportunity to litigate the amount of acid waste attributable to the production of avgas. The Government lost, and it is now precluded from relitigating the issue of damages.

Nor is there any genuine dispute of material fact as to the *amount* of damages in this case. There are three categories of damages at issue: (1) interest accruing after November 30, 2015 on costs incurred *before* December 1, 2015, which continued to accrue until the Government reimbursed those costs on April 1, 2019; (2) costs incurred *after* November 30, 2015; and (3) interest on costs incurred *after* November 30, 2015. The amounts of the first and third categories of damages are determined by simple arithmetic: the CSA allows recovery of 2.5 percent simple

15

interest that continues to run until the date of payment, *see* 41 U.S.C. § 106(f) (2010), and so the interest owed to the Oil Companies is calculated by applying that interest rate to the relevant costs. *See* Bourke Decl. ¶¶ 9(b), 9(d)–(e), 9(g)–(h), 11–12 (A206–07); PX11 (A210); PX13–14 (A212–13); PX16–17 (A215–16). In the last lawsuit, the Government never disputed the calculation of the amount of interest owed to the Oil Companies, and there is no genuine basis for doing so here.

With regard to the second category, Edmond Bourke—the EPA-approved supervisor of the remediation at the McColl Site whose testimony was credited by this Court in the last lawsuit, *see CFC Damages Decision*, 130 Fed. Cl. at 29 n.31—has documented the costs the Oil Companies incurred after November 30, 2015, through September 30, 2019. *See* Bourke Decl. ¶¶ 9(c), 9(f) (A206); PX12 (A211); PX15 (A214). The Government did not dispute the accuracy of Mr. Bourke's accounting of post-2002 costs incurred through November 30, 2015, before the Federal Circuit, *see Fed. Cir. Damages Decision*, 896 F.3d at 1312 n.11, and there is no genuine reason to dispute his accounting of the most recent costs. Because the Federal Circuit has already held that the Oil Companies are entitled to indemnification for 100 percent of their CERCLA response costs, with interest, and because there is no genuine dispute of material fact as to the amount of those costs and interest, the Oil Companies are entitled to summary judgment on damages.

## III.   The Government's Insurance-Offset Defense Fails as a Matter of Law.

That should be the end of this case. Unfortunately, the Government—having lost before the Federal Circuit on liability and damages in the last round of litigation—has indicated that it will attempt to resurrect an affirmative defense that, although certainly dead, the Government insists is not yet buried. The Government has made clear to the Oil Companies that it intends to argue that it is entitled to offset the damages it owes to the Oil Companies by the amount of insurance proceeds the Oil Companies allegedly recovered from their insurers during the 1990s.

16

The Government tried to raise this insurance-offset defense in the last case, and the defense was rejected as untimely both by this Court and by the Federal Circuit. Any attempt to present the defense yet again must fail as a matter of law for three independent reasons. First, because the Government failed to timely raise the insurance-offset defense during the decade these same issues were previously litigated in this Court, *res judicata* precludes the Government from raising it in this case. Second, the insurance-offset defense is foreclosed by the well-established rule that a breaching party is not entitled to an offset when the breach victim passes the costs of the breach to a third party in a transaction that is ancillary to the breach. Third, the Government's insurance-offset defense is barred by the collateral-source rule. For each and all of these reasons, the insurance-offset defense fails as a matter of law, and the Oil Companies are entitled to summary judgment.

### A. The Federal Circuit Previously Rejected the Government's Insurance-Offset Defense.

This is not the first time the Government has attempted to raise an insurance-offset defense. After the Federal Circuit held that the Government was liable for breaching the Avgas Contracts, it remanded for a trial on damages. *Fed. Cir. Liability Decision*, 751 F.3d at 1303. On remand, the Government served discovery requests on the Oil Companies seeking wide-ranging discovery into the Oil Companies' alleged insurance recoveries arising out of global environmental-cleanup litigation and settlements. *Fed. Cir. Damages Decision*, 896 F.3d at 1305. The Government made these requests in support of its anticipated insurance-offset defense, a defense that it had not pleaded in its answer and had never previously even *hinted* it would raise. *Id.* The Oil Companies moved for partial summary judgment on the insurance-offset defense, and the Government later moved to amend the pleadings to assert both its offset defense and related (and specious) fraud counterclaims. *Id.*

This Court held, *inter alia*, that the Government had waived the insurance-offset defense by failing to plead the defense in its answer, and therefore granted the Oil Companies' motion for partial summary judgment and denied the Government's motion to amend. *Id.* at 1306; *Shell Oil Co. v. United States*, 123 Fed. Cl. 707, 719, 725–27 (2015), *aff'd*, 896 F.3d 1299 (Fed. Cir. 2018). This Court held that the insurance-offset defense was an affirmative defense that had to be pleaded in the Government's answer. *Id.* at 719. It then found that "the Government was aware of the fact of the existence of the Oil Companies' insurance policies and coverage litigation as early as 1992 and certainly by 1997," *id.* (emphasis omitted), and it held that "the Oil Companies w[ould] be substantially prejudiced by having to engage in a whole new area of discovery more than twenty years after the CERCLA litigation began and nearly ten years after the breach of contract counterclaim was transferred to the United States Court of Federal Claims," *id.*; *see also id.* at 727. The Court therefore barred any insurance-related discovery.

The Federal Circuit affirmed. It first agreed with this Court that "[t]he Government's assertion of mitigated damages incurred by breach of contract due to third party payment is an affirmative defense and hence waivable." *Fed. Cir. Damages Decision*, 896 F.3d at 1315. Because "the Government should have asserted any offset related to insurance policies in its 2008 Answer," the Court of Appeals held, "the Government waived this defense." *Id.* at 1316. The Federal Circuit went on to hold that the Oil Companies would be prejudiced if the Government were allowed to amend its answer because "nearly a decade had passed since the Oil Companies filed their Complaint in the Court of Federal Claims, and more than seven decades had passed since the operative events that gave rise to the insurance policies." *Id.* (citation omitted).

The Government now attempts to raise the offset defense yet again: seven decades after the events giving rise to the insurance policies; nearly three decades after the Government first

sued the Oil Companies under CERCLA; after the parties spent a dozen years litigating breach-of-contract claims that required two summary judgment proceedings, a damages trial in this Court, and three trips to the Federal Circuit; and after both this Court and Federal Circuit squarely rejected the insurance-offset defense because it had come too late and would have substantially prejudiced the Oil Companies if it had been allowed to move forward. This saga has gone on long enough. Both this Court and the Federal Circuit have decisively held that the Oil Companies are entitled to recover 100 percent of the remediation costs that they incur at the McColl Site, and this Court should reject the Government's final attempt to avoid its contractual obligations.

### B.   The Insurance-Offset Defense Is Barred by *Res Judicata*.

"Res judicata prevents litigation of all grounds for, *or defenses to*, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Brown v. Felsen*, 442 U.S. 127, 131 (1979) (emphasis added); *see also Heiser v. Woodruff*, 327 U.S. 726, 735 (1946). Thus, "[w]hen a valid and final personal judgment is rendered in favor of the plaintiff . . . the defendant cannot avail himself of defenses he might have interposed, or did interpose, in the first action." RESTATEMENT (SECOND) OF JUDGMENTS § 18 (1982). As the Supreme Court explained over a century ago:

> If such defences were not presented in the action, and established by competent evidence, *the subsequent allegation of their existence is of no legal consequence*. The judgment is as conclusive, so far as future proceedings at law are concerned, *as though the defences never existed*. . . . Such demand or claim, having passed into judgment, cannot again be brought into litigation between the parties in proceedings at law upon any ground whatever.

*Cromwell v. Sac Cty.*, 4 Otto (94. U.S.) 351, 352–53 (1876) (emphases added).

In line with Supreme Court precedent, the Federal Circuit has held that *res judicata* bars defenses that could have been raised in prior litigation. For instance, in *Hallco Manufacturing Co. v. Foster*, Foster sued Hallco for patent infringement arising out of the Hallco I device, and Hallco

19

raised the defense of invalidity. 256 F.3d 1290, 1293 (Fed. Cir. 2001). The parties eventually entered into a settlement whereby Hallco agreed to take a non-exclusive, royalty-bearing license, and the case was dismissed with prejudice. *Id.* Hallco subsequently developed the Hallco II device and sought a declaratory judgment that Foster's patent was invalid. *Id.* The Federal Circuit held that Hallco was "precluded from challenging validity in a suit for infringement of any device that is the same as the Hallco I, because invalidity was a defense that was or could have been raised in the prior litigation." *Id.* at 1297. The Federal Circuit remanded for a determination of whether the two Hallco devices were, in fact, the same; "[i]f so, claim preclusion applie[d]," and the invalidity defense was barred. *Id.*; *see also Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 478–80 (Fed. Cir. 1991).

*Res judicata* applies where "(1) there is identity of parties (or their privies); (2) there has been an earlier final judgment on the merits of a claim; and (3) the second claim is based on the same set of transactional facts as the first." *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 1371–72 (Fed. Cir. 2013). Each prong of the test is clearly met here: (1) the parties to this litigation and the previous litigation are identical (i.e., the Oil Companies and the United States); (2) the Federal Circuit affirmed this Court's judgment in favor of the Oil Companies, *see Fed. Cir. Damages Decision*, 896 F.3d at 1316, and that judgment became final when the United States chose not to pursue *en banc* or Supreme Court review; and (3) this litigation is based on the same set of transactional facts as the first round of litigation—namely, the Government's breach of the Avgas Contracts due to its failure to indemnify the Oil Companies for the CERCLA response costs they have incurred at the McColl Site by reason of the production of avgas during World War II, *see Foster*, 947 F.2d at 478 ("claim" consists of "the facts giving rise to the suit"). Accordingly, the Government is now precluded from asserting a defense against damages that it could have timely raised in the previous case. It is "as though the defence[ ] never

existed." *Cromwell*, 4 Otto (94 U.S.) at 353; *see also United States v. Shanbaum*, 10 F.3d 305, 313–14 (5th Cir. 1994) (holding a defense barred by *res judicata* in similar context).

### C.    The Insurance-Offset Defense Is Barred by the Remote-Transaction Rule.

Even if the Government's insurance-offset defense were not precluded by *res judicata*, it would be barred as a matter of law because it violates the well-established rule that courts will not consider remote transactions in the calculation of damages. That rule was first announced over a century ago by Justice Oliver Wendell Holmes in *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531 (1918). In that case, a lumber company sought to recover damages from Southern Pacific, a railroad, because the latter had charged excessive rates. *Id.* at 533. Southern Pacific argued that the lumber company had not been harmed because it had been "able to pass on the damage that [it] sustained" from paying the excessive rates to its customers by charging higher prices for lumber. *Id.*

In rejecting Southern Pacific's argument, the Supreme Court articulated the remote-transaction rule: "The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant[,] so it holds him liable if proximately the plaintiff has suffered a loss." *Id.* at 533–34. What mattered was that the lumber company had suffered damages as a result of the excessive rates; that the lumber company might have passed on its damages to its customers was irrelevant. The rationale behind the remote-transaction rule is simple: if courts do not cut off the damages calculation at "the first step," they will quickly find themselves lost in "the endlessness and futility of the effort to follow every transaction to its ultimate result." *Id.* at 534. The calculation of damages would become a hopeless and speculative exercise if every transaction by which a plaintiff offset his damages had to be taken into account.

21

Significantly, the Supreme Court used insurance as an example of the kind of remote transaction that should *not* be considered when calculating damages. After articulating the remote-transaction rule, Justice Holmes compared (1) the lumber company's passing-on of the excessive rates to its customers with (2) the recovery of insurance proceeds, and he found both equally irrelevant to calculating the damages owed by Southern Pacific. "Perhaps strictly the securing of such an indemnity as the present might be regarded as not differing in principle from the recovery of insurance, as res inter alios, with which the defendants were not concerned." *Id.* In the same way, any proceeds that the Oil Companies might have recovered from their insurers based on the McColl Site are remote transactions "with which the [Government] [is] not concerned." *Id.*

Both this Court and the Federal Circuit have applied the remote-transaction rule in calculating damages for breach of contract. In *Hughes Communications Galaxy, Inc. v. United States*, for example, the Government sought an offset to breach-of-contract damages because the plaintiff had passed the damages on to its customers, arguing that "Hughes should not be allowed a 'double recovery' from both the government and its customers." *Hughes Commc'ns Galaxy, Inc. v. United States*, 38 Fed. Cl. 578, 580 (1997). This Court rejected the Government's argument, holding that "Hughes should receive the benefit of the bargain it struck with the government." *Id*. The Court based its holding, in part, on the principle that "there are certain damages that, as a matter of law, the courts will find too remote," quoting Justice Holmes's articulation of the remote-transaction rule in *Southern Pacific*. *Id.* at 582. Because the Government's offset defense would have led to a complex damages calculation involving remote transactions, it would have forced the Court to engage in a "highly speculative" analysis and confronted the Court with a damages determination of "nearly insuperable difficulty." *Id.* (quoting *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 493 (1968)).

The Federal Circuit affirmed. *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d. 1060, 1072 (Fed. Cir. 2001). In doing so, the Court of Appeals expressly held that the principle of *Southern Pacific* "applies to this breach of contract action." *Id.*  The Federal Circuit relied on the same quotations from Justice Holmes and *Hanover Shoe* in explaining that "a standard for pass-through reductions would entail extremely difficult burdens for the trial court" because of the difficulty of determining the price the plaintiff could have charged absent the breach. *Id*. This Court has subsequently relied on the remote-transaction rule described in *Hughes Communications* when rejecting a Government offset defense based on third-party transactions. *See Duke Energy Progress, Inc. v. United States*, 135 Fed. Cl. 279, 297–98 (2017); *Wisconsin Elec. Power Co. v. United States*, 90 Fed. Cl. 714, 794–95 (2009) ("[a]n injured party's recovery from third parties does not decrease the amount of the wrongdoer's liability"); *see also Maine Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372, 382 n.10 (1999) (*Hughes Communications* "concluded in a breach of contract action that the contractor's ability to receive indemnification from third parties in no way affected the measure of the damages resulting from the Government's breach").

Two years after *Hughes Communications*, in *LaSalle Talman Bank, F.S.B. v. United States*, the Federal Circuit again quoted Justice Holmes' statement of the remote-transaction rule from *Southern Pacific* and rejected the Government's argument that damages should be offset by payments received by the plaintiff from a third party. 317 F.3d 1363, 1373 (Fed. Cir. 2003). *LaSalle* was a *Winstar* case in which an Act of Congress disallowed the counting of supervisory goodwill toward savings and loan capital requirements, in breach of earlier contracts with the plaintiff. *Id.* at 1367–68. In order to meet the new capital requirements, the plaintiff obtained a $300 million capital infusion, and the Court counted this investment against the plaintiff's damages because the transaction was proximately caused by the breach. *Id.* at 1373–74. But the Court

23

rejected the Government's argument that subsequent capital infusions made after the initial investment should also be counted against damages even though the subsequent investments would not have occurred but for the breach. The later investments "were commercial activity remote from the actions taken to achieve compliance with FIRREA [i.e., the statute that effected the breach of contract]." *Id.* at 1374; *see also Duke Energy Progress*, 135 Fed. Cl. at 298 ("*LaSalle Talman Bank* actually cited and reaffirmed *Hughes*, as well as the general rule 'not to go beyond the first step' stated by Justice Holmes in *Southern Pacific* . . . .").

As *Southern Pacific* itself makes clear, recovery on an insurance policy is a paradigmatic example of the "remote consequences of contract breach," *id.* at 1373, and under *Hughes* and *LaSalle*, it does not count against breach-of-contract damages. The insurance contract is a collateral transaction, not one "directly related to or [a] direct consequence[] of the breach." *LaSalle*, 317 F.3d at 1373. Instead of arising *from* the breach, an insurance contract *preexists* the breach. The actual payment on the claim is simply the fulfillment of an unrelated contractual obligation that *antedated* the breach. *Cf. John Munic Enters., Inc. v. Laos*, 326 P.3d 279, 285 (Ariz. Ct. App. 2014); ("[I]t makes little sense, in the name of fulfilling the expectations of the contract, to give the breaching party the benefit of a separate contract negotiated *before* the breach by the non-breaching party with a third party." (emphasis added)). Such "subsequent reimbursement" is not "of any concern to the wrongdoers." *Adams v. Mills*, 286 U.S. 397, 407 (1932).

Although these precedents suffice to establish the irrelevance of the Oil Companies' insurance policies as a matter of law, the facts of this case exemplify why the Supreme Court in *Southern Pacific* used insurance recoveries as an example of remote consequences excluded from damages calculations. Determining how much, if any, of the Oil Companies' insurance proceeds are attributable to the McColl Site would be extraordinarily difficult because the Oil Companies'

omnibus insurance recoveries resolved countless actual and threatened claims on hundreds of insurance policies that were in effect during different periods over half a century. All told, these settlements involved hundreds of insurers, covered hundreds (if not thousands) of sites, and included claims for, among other things, personal injury and property damage that have no relevance to the CERCLA remediation costs at issue in this case. *See* Platt Decl. ¶ 4, 6, 7 (A226–27); Kezos Decl. ¶ 6, 8, 11 (A222–23).[4] Complicating matters further, the insurance settlements rarely, if ever, allocated recoveries to specific sites. *See* Platt Decl. ¶ 7 (A227) ("[T]he settlement agreements . . . typically resolved all three cases at once, without any allocation between cases, let alone between claims."); Kezos Decl. ¶ 6 (A222) ("The settlements did not identify specific dollar amounts, or percentages, for any individual sites."); *id.* ¶ 13 (A224) ("None [of the settlements] specifically assign dollar amounts or otherwise allocate settlement proceeds to the multiple claims asserted for the McColl site, or in any way direct the funds to individual sites or specific claims.").

Shell, for example, combined its McColl claims with much larger claims involving the Rocky Mountain Arsenal and brought suit in San Mateo, California. Platt Decl. ¶ 4 (A226). It litigated with hundreds of insurers for more than fifteen years. *Id.* ¶¶ 4, 8 (A226–27). Along the way, it filed two additional lawsuits against its historical insurers involving claims related to asbestos and pesticide personal injuries, damage to property caused by polybutylene pipe, personal injuries due to toxic exposures, and injuries to third-parties associated with Shell's marketing operations. *Id.* ¶ 6 (A226–27). The three lawsuits—and the thousands of claims and potential claims they involved—were settled between 1995 and 1999 in over three dozen different

---

[4] In the prior case, the Government did not dispute any of the facts discussed in the Formoso, Kezos, or Platt declarations, and there is no genuine reason for the Government to do so here.

settlement agreements; very few allocated the settlement proceeds between the three cases, *let alone to specific claims*. *Id.* ¶ 7 (A227); *accord.* Kezos Decl. ¶¶ 6–13 (A222–24).

Any attempt to allocate the settlement proceeds to the McColl CERCLA claim would require the parties and the Court to wade into this morass of decades-old settlements and litigation. Any such allocation could potentially implicate numerous subsidiary questions and analyses, including but not limited to, the following:

a) The identification of insurance policies that were arguably included within each of the global settlements;

b) The identification and analysis of any such insurance policies that might arguably have provided coverage respecting the McColl Site;

c) The identification and analysis of the types of claims and occurrences that are arguably covered by each such insurance policy, as well as the identification and analysis of potential exclusions to such coverage;

d) The identification and analysis of any applicable coverage limits and retention amounts/deductibles, as well as any other policy terms and conditions;

e) The identification and analysis of each claim that was made or threatened against each Oil Company with respect to the McColl Site, and a comparison of such claims with the McColl CERCLA claim;

f) An analysis of the numerous environmental damage claims that were arguably covered by each insurance policy at issue, and a comparison of those claims to the McColl claims, including the McColl CERCLA claim;

g) An analysis of the amount recovered by each Oil Company from each insurance company, and a comparison of any such recoveries to the claims for which each Company sought coverage from the insurance companies.

All this would, in addition, be further complicated by the passage of several decades since the settlements took place. *See* Kezos Decl. ¶ 5 (A221) ("[T]here are no employees who have first-hand knowledge of the insurance programs for Atlantic Richfield or first-hand knowledge regarding the underlying transactions related to the insurance coverage litigation."); Formoso Decl. ¶ 6 (A218) ("[T]here are few, if any, current Texaco, Union Oil, or Chevron employees who have first-hand knowledge of the existence and location of all [requested insurance] information."). Indeed, with regard to at least one Company, "many of the insurance settlements and other relevant documents were in the possession of outside counsel, including at least one law firm that no longer exists." Formoso Decl. ¶ 8 (A219). It is little wonder, then, that the Federal Circuit affirmed this Court's refusal to undertake the analysis required by the Government's offset defense. *See Fed. Cir. Damages Decision*, 896 F.3d at 1316.

The Government is seeking to "follow every transaction to its ultimate result," but *Southern Pacific* instructs that such an effort is "endless[ ] and futil[e]" with respect to insurance. 245 U.S. at 534. This case highlights the wisdom of Justice Holmes's refusal to go "beyond the first step," *id.* at 533, a principle that the Federal Circuit has repeatedly invoked. The Government's insurance-offset defense violates the remote-transaction rule and fails as a matter of law.

### D.  The Insurance-Offset Defense Is Barred by the Collateral-Source Rule.

The collateral source rule holds that "collateral benefits received by the injured party do not reduce the damages owed by the wrongdoer." *LaSalle Talman Bank*, 317 F.3d at 1372. Under this rule, "defendants are not permitted to avoid payment of full compensation for the injury

27

inflicted merely because the victim has had the foresight to provide himself with insurance."
*Shelden v. United States*, 34 Fed. Cl. 355, 372 (1995) (quotation marks omitted).

Although the collateral-source rule is often associated with tort law, it also applies to
breach-of-contract actions. For example, in *ADM Investor Services., Inc. v. Collins*, ADM sued
Collins for breach of a contract governing futures trades. 515 F.3d 753, 754–55 (7th Cir. 2008).
Another entity had guaranteed the trades, and as a result, covered a portion of the losses ADM
suffered as a result of the breach. Collins argued that the third-party entity, not ADM, was the real
party in interest. The Seventh Circuit rejected that argument:

> The brief reads as if counsel . . . had never heard of the collateral-source doctrine.
> That a third party reimburses part of a loss does not disable the injured person from
> recovering under tort *or contract law* . . . . How ADM and [the third party] settle
> accounts between themselves is none of Collins's business.

*Id*. at 755 (emphasis added). Thus, the fact that the victim in a breach of contract suit had been
reimbursed by a third party as a result of the breach was irrelevant to the victim's suit against the
breaching party. *See also, e.g.*, *Dominion Res., Inc. v. Alstom Power, Inc.*, 825 S.E.2d 752, 757
(Va. 2019); *Hall v. Miller*, 465 A.2d 222, 226–27 (Vt. 1983); *John Munic Enters., Inc. v. Laos*,
326 P.3d 279, 285 (Az. Ct. App. 2014); *Technical Computer Servs., Inc. v. Buckley*, 844 P.2d
1249, 1253–54 (Colo. App. 1992).

In line with these precedents, the Federal Circuit has held that the collateral-source rule can
apply in breach-of-contract cases. In *LaSalle*, the Federal Circuit explained that the collateral-
source rule "has been applied in connection with breach of contract, when there is a tortious or
negligence component to the breach, *or when the equitable balance is such that any windfall
should not benefit the wrongdoer*." 317 F.3d at 1372 (emphasis added). Application of the
collateral-source rule was inappropriate in *LaSalle* for two reasons. First, "the breach of contract
was due to an Act of Congress" enacted "to make a fundamental change in savings and loan

regulatory policy and procedure, for the greater public." *Id*. In those circumstances, "[n]either bad faith nor misconduct nor negligence can be attributed to the governmental actions that produced the FIRREA-based breach of contract." *Id*. at 1373. Second, even leaving aside the circumstances of the breach, the money that the Government sought to use as an offset was the result of a transaction LaSalle entered into *after* the breach, and because this "substitute transaction" was no more than "mitigation of the injury caused by the breach"—which the victim of a breach has an obligation to pursue—it was proper to deduct these funds from the damages owed by the Government. *Id*. at 1372, 1371; *see also Kansas Gas & Elec. Co. v. United States*, 685 F.3d 1361, 1368 (Fed. Cir. 2012) (characterizing *LaSalle*'s rejection of the collateral-source rule as being based on the fact that LaSalle's funds were a form of mitigation). The equitable balance therefore disfavored the collateral-source rule. *LaSalle*, 317 F.3d at 1373.

Here, by contrast, the equitable balance strongly *favors* application of the collateral-source rule. Unlike *LaSalle*, the breach of contract in this case was not the result of an Act of Congress enacted for the public good; it was the result of the Government simply refusing to perform its contractual obligations. The Government's breach is especially egregious given the circumstances of this case. After promising to indemnify the Oil Companies for their critical assistance in winning World War II, the Government turned around and imposed tens of millions of dollars of liability on the Oil Companies, and it then spent almost three decades fighting efforts to require it to live up to its indemnification responsibilities. When, at long last, the Federal Circuit squarely held that the Government *did* have to indemnify the Oil Companies for 100 percent of the McColl remediation costs, the Government *yet again refused to perform*, thereby necessitating this additional lawsuit. In these circumstances, the equities are entirely on the side of the Oil Companies.

Moreover, the source of the disputed funds in this case—insurance—is a paradigmatic collateral source that courts exclude from the calculation of damages, and there are numerous, sound reasons why courts—including the Federal Circuit and this Court—do so. First, because the victim of the breach paid premiums to obtain the benefit of insurance, it would be highly inequitable to instead give *the breaching party* the benefit of any insurance recovery by deducting that recovery from the damages the breaching party owes to the victim. As the Virginia Supreme Court recently said in holding that the collateral-source rule applies to breach-of-contract actions involving insurance: "The party effecting the insurance paid the full value for it, and there is no equity in the claim of the defendant to the benefit of a contract for which it gave no consideration." *Dominion Res., Inc.*, 825 S.E.2d at 757 (alteration omitted). In so holding, the Virginia Supreme Court relied on the reasoning of the Arizona Court of Appeals:

> [W]hen a party has paid valuable consideration before the breach to a collateral source to insure against a loss or otherwise to protect its interest, there is no logical reason to deny that party a benefit it has paid for and grant it to another party who neither negotiated for it, paid for it, nor absorbed the opportunity costs of securing it, but who has precipitated the loss.

*Id.* at 756 (quoting *John Munic Enters.*, 326 P.3d at 285); *see also Helfend v. Southern Cal. Rapid Transit Dist.*, 465 P.2d 61, 66 (Cal. 1970) ("a person who has invested years of insurance premiums to [hedge against risk] should receive the benefits of his thrift").

As the eminent contracts scholar Joseph Perillo, editor of *Corbin on Contracts*, has observed: "The rationale for applying the collateral source rule in [insurance] cases is clear. *No consideration was paid by the breaching party*." Joseph M. Perillo, *The Collateral Source Rule in Contract Cases*, 46 San Diego L. Rev. 705, 710 (2009) (emphasis added); *see also* John G. Fleming, *The Collateral Source Rule and Contract Damages*, 71 Calif. L. Rev. 56, 81 (1983) (same). The Oil Companies provided *separate*, valuable consideration for two *distinct* sets of

contracts: the Avgas Contracts, and their insurance contracts. *See* Platt Decl. ¶ 13 (A228) ("None of the premiums for any of the insurance policies . . . were paid by the Government."); Kezos Decl. ¶ 10 (A223) (same). The Government's offset argument would collapse those two sets of contracts into a single, absurd bargain: one in which the Oil Companies paid valuable consideration to their insurers to subsidize *the Government's breach* of the Avgas Contracts. No principle of law or equity sanctions such a result.

That is why both the Federal Circuit and this Court have repeatedly rejected the argument that the Government can offset the damages it owes based on a victim's insurance recoveries. In *F.B. Leopold Co. v. Roberts Filter Manufacturing Co.*, 1997 WL 378004, 119 F.3d 15 (Fed. Cir. 1997) (unpublished opinion), this Court had awarded attorney's fees to Roberts, and Leopold argued that the award "would result in an impermissible double recovery because Roberts's insurer is reimbursing at least a portion of its attorney fees." Op. at 7. The Federal Circuit held otherwise, emphasizing that the insurance proceeds arose from a separate contractual relationship: "Roberts's insurance recovery, if any, results from a contractual agreement in which Roberts traded a sum certain (a premium) for an uncertain future recovery in order to reduce its business risk." *Id.* Because Roberts—not Leopold—paid the insurance premiums, the Federal Circuit stated that "[i]t would be an odd result if we were to reward Leopold for Roberts's foresight." *Id.*

In line with the Federal Circuit's reasoning, this Court applied the collateral-source rule in *Sweet v. United States* and permitted the recovery of attorney's fees pursuant to an indemnification agreement even though the indemnitee had separately recovered those fees via insurance. 63 Fed. Cl. 591, 595, 598 (2005). *Sweet* held that this result was entirely consistent with *LaSalle*, since the funds at issue in *LaSalle* were not the result of a separate indemnification contract that pre-existed the breach and was supported by separate consideration. *Id.* at 598. In so holding, this Court relied

31

on a large body of precedent from other Courts of Appeals that have uniformly held that an "indemnitor could not avoid its indemnification responsibility through 'the fortuity of the indemnitee having obtained a liability insurance policy.' " *Id.* at 597 (quoting *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1220–21 (5th Cir. 1986); *see also Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 580 F.2d 1222, 1230 (4th Cir. 1978) ("the right to indemnity is not defeated by the fact that the loss to be indemnified for was actually paid by an insurance company"); *Crosson v. N. V. Stoomvaart Mij "Nederland"*, 409 F.2d 865, 868 (2d Cir. 1969); *Spurr v. LaSalle Const. Co.*, 385 F.2d 322, 331 (7th Cir. 1967) ("the fact that the indemnitee's liability was covered by insurance does not negate the indemnitor's obligation"); *North Cent. Airlines, Inc. v. City of Aberdeen, S. D.*, 370 F.2d 129, 134 (8th Cir. 1966); *Safway Rental & Sales Co. v. Albina Engine & Mach. Works, Inc.*, 343 F.2d 129, 134–35 (10th Cir. 1965); *Lesmark, Inc. v. Pryce*, 334 F.2d 942, 945 (D.C. Cir. 1964).

*Hughes Communications Galaxy* is to the same effect. Recall that, in that case, Hughes had been able to pass on the cost of the Government's breach to its customers. This Court observed that, insofar as Hughes's customers "agree[d] to pay any of the damages caused by the government's breach" without knowing what, if any, those damages would be in the future, a Hughes customer "in effect, becomes a contractual insurer to Hughes." 38 Fed. Cl. at 581. Yet, this Court held that "it is clear that the breaching party cannot benefit from such *de facto* insurance, and thus shift the loss to third parties." *Id.* Like *Sweet*, *Hughes Communications Galaxy* relied on a long line of precedent supporting application of the collateral-source rule to exclude consideration of "*de facto*" insurance recoveries in a contract case. *See id.* at 581 n.3 (citing *North Slope Technical, Ltd. v. United States*, 27 Fed. Cl. 425, 429 (1992)); *see also Container Co. v. United States*, 90 F. Supp. 689, 694 (Ct. Cl. 1950) (holding that the Government's obligation under

32

a contract to pay the costs of fire damage was "not affected by the fact that The Container Company had insurance on the [damaged] property"); *S.W. Aircraft Inc. v. United States*, 551 F.2d 1208, 1211 (Ct. Cl. 1977) (because the Government did not pay for the insurance policy on which the plaintiff recovered in that case, the plaintiff could bring the action for recovery on a contract).[5]

The Government has claimed that the Oil Companies would obtain an unjust double recovery if the collateral-source rule were applied here, but as the Virginia Supreme Court recognized earlier this year, where the victim of a breach has applicable insurance, *it may be inevitable* that either the victim or the breaching party will obtain a windfall as a result of the breach; the key question is *which* party should obtain that windfall:

> Whenever a plaintiff has a source of recovery collateral to the defendant, it will either (1) give the plaintiff a double recovery and leave him or her in a better financial position than before the injury, or (2) permit the defendant to escape full liability for all damages resulting from his wrong.

*Dominion Res., Inc.*, 825 S.E.2d at 756. As between these two options, the correct choice is clear: "Because the law must sanction one windfall and deny the other, it favors the victim of the wrong rather than the wrongdoer." *Id.* That is entirely fair, since the victim of the breach *paid separately for the insurance*. To allow the Government to obtain the benefit of the Oil Companies' insurance policies would violate "the settled principle that a breaching party should never be placed in a

---

[5] *Kansas City Power & Light Co. v. United States*, 143 Fed. Cl. 134, 147 (2019), which rejected application of the collateral-source rule for insurance recoveries in a breach-of-contract action, is distinguishable because the equities favoring the Oil Companies are much stronger. Moreover, we respectfully submit that the *Kansas City Power & Light* court did not cite—let alone analyze—*F.B. Leopold*, *Hughes Communications Galaxy*, or the long line of cases on which both *Sweet* and *Hughes Communications Galaxy* rely. Instead, it ignores the numerous reasons why insurance recoveries are distinguishable from the funds at issue in *LaSalle*, overlooks the significance of *LaSalle*'s discussion of the "equitable balance" in a collateral-source-rule analysis, and fails to discuss the large body of scholarship and caselaw favoring the application of the collateral-source rule in this context. It is not persuasive.

better position as a result of its breach." *Sacramento Mun. Util. Dist. v. United States*, 566 F. App'x 985, 997 (Fed. Cir. 2014).

In any event, any insurance recoveries attributable to the McColl Site—if they exist at all— would be miniscule. Shell, for example, sought coverage in various actions for policies with coverage periods from 1942 through July 1, 1994. Platt Decl. ¶¶ 4–6 (A226–27). The settlements that resulted from these actions involved hundreds of insurers and probably thousands of policies. *Id.*; *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 15 Cal. Rptr. 2d 815, 827–28 (Ct. App. 1993) ("Shell's suit involved the meaning and applicability of approximately 800 insurance policies."). Given that the settlements involved such an enormous number of policies, the universe of policies from the avgas-contracting period—and the amounts recovered that would be specifically attributable to the McColl Site—would be insignificant. *See Dominion Res., Inc.*, 825 S.E.2d at 757 ("the supposed 'double recovery' often will prove to be more hypothetical than actual").

Applying the collateral source rule to insurance recoveries makes sense because the collateral source rule typically applies "to *pre-breach* efforts by the plaintiff which have damages minimizing effects." 3 DAN B. DOBBS, DOBBS LAW OF REMEDIES:  DAMAGES-EQUITY-RESTITUTION § 12.6(4) (2d ed. 1993) (emphasis added). That perfectly describes the funds at issue here: the Oil Companies entered into their insurance contracts *before* the Government breached the Avgas Contracts. Indeed, any insurance policies with coverage periods that included the time when the Oil Companies deposited acid waste at the McColl Site were purchased by the Oil Companies during World War II – *six decades before the Government's breach*. This is in stark contrast with the funds at issue in *LaSalle*, which were "benefits of the actions taken *after* the breach" and, therefore, properly viewed as mitigation that had to be deducted from damages. 317 F.3d at 1366.

34

Indeed, *failure* to apply the collateral-source rule in breach-of-contract cases would create perverse incentives. If a breaching party can use the victim's insurance proceeds to reduce the damages it owes, contracting parties will be given an incentive to breach whenever the other party maintains insurance. Application of the collateral source rule, then, "helps to discourage opportunistic breaches when the breaching party relies on the victim's insurance . . . to [ ] rescue [ ] the victim of the breach." Perillo, *supra*, at 711; *cf. John Munic Enters.*, 326 P.3d at 285 (refusal to apply the collateral source rule to insurance in contract cases "would . . . place the breaching party in a better position than if it had performed the contract. Such a result is illogical . . . ."). Failure to apply the collateral source rule in cases like this would permit a " 'contract breaker [to] tak[e] advantage of an externality and thus distort the true cost of his reallocation of resources.' " Perillo, *supra*, at 711 (quoting Fleming, *supra*, at 62 n.29).

Failure to apply the collateral source rule would also *discourage* the purchase of insurance. "The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds." *Helfend*, 465 P.2d at 66. But if the breaching party is permitted to reduce its obligation to pay damages through the injured party's insurance, "plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit." *Id.* Applying the collateral source rule to breach of contract cases involving private insurance is essential if courts wish to encourage the purchase of insurance by contracting parties.

Finally, it is important to note that the collateral source rule and the remote-transaction rule have different rationales and apply independently. *LaSalle* is a case-in-point: the Federal Circuit

rejected the application of the collateral source rule but applied the remote-transaction rule to exclude certain offsets from a breach-of-contract damages calculation. *See* 317 F.3d at 1372–73 (rejecting application of the collateral-source rule on the facts of that case); *id.* at 1373–74 (applying the remote-transaction rule). The collateral source rule is an "equitable" principle that prevents the breaching party from obtaining a "windfall." *Id.* at 1372. The remote-transaction rule, by contrast, is concerned with placing reasonable limits on the considerations that are relevant to the calculation of damages. It refuses to go "beyond the first step" because of the "endlessness and futility of the effort to follow every transaction to its ultimate result." *Southern Pac. Co.*, 245 U.S. at 533, 534.

*LaSalle* makes clear that the collateral-source rule applies to breach-of-contract actions where the "equitable balance" disfavors providing a windfall to the breaching party. 317 F.3d at 1372. Failure to apply the rule to insurance proceeds "would subsume the expectations of the third-party contract into the breached contract, devaluing or eliminating the separate benefit of the third-party contract which was supported by separate consideration, and place the breaching party in a better position than if it had performed the contract." *Dominion Res., Inc.*, 825 S.E.2d at 756–57 (quoting *John Munic Enters.*, 326 P.3d at 285). The Government should not be permitted to subsidize its breach of contract via the Oil Companies' insurance premiums. That is manifestly inequitable, and this Court should apply the collateral-source rule to bar the Government's insurance-offset defense.

## CONCLUSION

Plaintiffs respectfully request that this Court grant their Motion for Summary Judgment and enter judgment as follows:

| Oil Company | Percentage of Damages | Damages |
|---|---|---|
| Shell Oil Company | 58.58% | $4,334,508.45 |
| Union Oil Company of California | 18.94% | $1,401,426.94 |
| Atlantic Richfield | 18.94% | $1,401,426.94 |
| Texaco Inc. | 3.54% | $261,935.13 |

November 25, 2019

Respectfully submitted,

*Of counsel*:
Vincent J. Colatriano
J. Joel Alicea
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

s/ Michael W. Kirk
Michael W. Kirk
*Counsel of Record*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
mkirk@cooperkirk.com

# STATUTORY ADDENDUM

United States Code Annotated
   Title 41. Public Contracts [Repealed]
      Chapter 2. Termination of War Contracts

This section has been updated. Click here for the updated version.

41 U.S.C.A. § 106

§ 106. Basis for settlement of termination claims

Effective: [See Text Amendments] to January 3, 2011

## (a) Priority to private contractors

It is the policy of the Government, and it shall be the responsibility of the contracting agencies and the Administrator of General Services to provide war contractors with speedy and fair compensation for the termination of any war contract, in accordance with and subject to the provisions of this chapter, giving priority to contractors whose facilities are privately owned or privately operated. Such fair compensation for the termination of subcontracts shall be based on the same principles as compensation for the termination of prime contracts.

## (b) Establishment of methods and standards

Each contracting agency shall establish methods and standards, suitable to the conditions of various war contractors, for determining fair compensation for the termination of war contracts on the basis of actual, standard, average, or estimated costs, or of a percentage of the contract price based on the estimated percentage of completion of work under the terminated contract, or on any other equitable basis, as it deems appropriate. To the extent that such methods and standards require accounting, they shall be adapted, so far as practicable, to the accounting systems used by war contractors, if consistent with recognized commercial accounting practice.

## (c) Conclusiveness of settlement

Any contracting agency may settle all or any part of any termination claim under any war contract by agreement with the war contractor, or by determination of the amount due on the claim or part thereof without such agreement, or by any combination of

39

these methods. Where any such settlement is made by agreement, the settlement shall be final and conclusive, except (1) to the extent otherwise agreed in the settlement; (2) for fraud; (3) upon renegotiation to eliminate excessive profits under section 1191 of Appendix to Title 50, unless exempt or exempted under such section; or (4) by mutual agreement before or after payment. Where any such settlement is made by determination without agreement, it shall likewise be final and conclusive, subject to the same exceptions as if made by agreement, unless the war contractor appeals or brings suit in accordance with section 113 of this title: *Provided,* That no settlement agreement hereunder involving payment to a war contractor of an amount in excess of $50,000 (or such lesser amount as the Administrator of General Services may from time to time determine) shall become binding upon the Government until the agreement has been reviewed and approved by a settlement review board of three or more members established by the contracting agency in the bureau, division, regional or district office, or other unit of the contracting agency authorized to make such settlement, or in the event of disapproval by the settlement review board, unless approved by the head of such bureau, division, regional or district office, or other unit. Failure of the settlement review board to act upon any settlement within thirty days after its submission to the board shall operate as approval by the board. The sole function of settlement review boards shall be to determine the over-all reasonableness of proposed settlement agreements from the point of view of protecting the interests of the Government. In determining, for purposes of this subsection, whether review of any settlement agreement is required because of the amounts involved, no deduction shall be made on account of credits for property chargeable to the Government or for advance or partial payments, but amounts payable under such settlement agreement for completed articles or work at the contract price and for the discharge of the termination claims of subcontractors shall be deducted.

### (d) Allowable costs

Except as hereinafter provided, the methods and standards established under subsection (b) of this section for determining fair compensation for termination claims which are not settled by agreement shall be designed to compensate the war contractor fairly for the termination of the war contract, taking into account--

**(1)** the direct and indirect manufacturing, selling and distribution, administrative and other costs and expenses incurred by the war contractor which are reasonably necessary for the performance of the war contract and properly allocable to the terminated portion thereof under recognized commercial accounting practices; and

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**(2)** reasonable costs and expenses of settling termination claims of subcontractors related to the terminated portion of the war contract; and

**(3)** reasonable accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war contract; and

**(4)** reasonable costs and expenses of removing, preserving, storing and disposing of termination inventories; and

**(5)** such allowance for profit on the preparations made and work done for the terminated portion of the war contract as is reasonable under the circumstances; and

**(6)** interest on the termination claim in accordance with subsection (f) of this section; and

**(7)** the contract price and all amounts otherwise paid or payable under the contract.

The following shall not be included as elements of cost:

**(i)** Losses on other contracts, or from sales or exchanges of capital assets, fees and other expenses in connection with reorganization or recapitalization, antitrust or Federal income-tax litigation, or prosecution of Federal income-tax claims or other claims against the Government (except as provided in paragraph (3) of this subsection); losses on investments; provisions for contingencies; and premiums on life insurance where the contractor is the beneficiary.

**(ii)** The expense of conversion of the contractor's facilities to uses other than the performance of the contract.

**(iii)** Expenses due to the negligence or willful failure of the contractor to discontinue with reasonable promptness the incurring of expenses after the effective date of the termination notice.

41

**(iv)** Costs incurred in respect to facilities, materials, or services purchased or work done in excess of the reasonable quantitative requirements of the entire contract.

The failure specifically to mention in this subsection any item of cost is not intended to imply that it should be allowed or disallowed. The Administrator of General Services may interpret the provisions of this subsection and may provide for the inclusion or exclusion of other costs in accordance with recognized commercial accounting practice.

Where the small size of claims or the nature of production or performance or other factors make it impracticable to apply the principles stated in this subsection to any class of settlements which are subject to this subsection, the contracting agencies may establish alternative methods and standards for determining fair compensation for that class of termination claims. The aggregate amount of compensation allowed in accordance with this subsection (excluding amounts allowed under paragraphs (3) and (4) of this subsection) shall not exceed the total contract price reduced by the amount of payments otherwise made or to be made under the contract.

## (e) Settlement by agreement

In order to carry out the objectives of this chapter, termination claims shall be settled by agreement to the maximum extent feasible and the methods and standards established under subsection (b) of this section shall be designed to facilitate such settlements. To the extent that he deems it practicable to do so without impeding expeditious settlements, the Administrator of General Services shall require the contracting agencies to take into account the factors enumerated in subsection (d) of this section in establishing methods and standards for determining fair compensation in the settlement of termination claims by agreement.

## (f) Interest

Each contracting agency shall allow and pay interest on the amount due and unpaid from time to time on any termination claim under a prime contract at the rate of 2 ½ per centum per annum for the period beginning thirty days after the date fixed for termination and ending with the date of final payment, except that (1) if the prime contractor unreasonably delays the settlement of his claim, interest shall not accrue for the period of such delay, (2) if interest for the period after termination on any advance payment or loan, made or guaranteed by the Government, has been waived for the benefit of the contractor, the amount of the interest so waived allocable to

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

the terminated contract or the terminated part of the contract shall be deducted from the interest otherwise payable hereunder, and (3) if after delivery of findings by a contracting agency, the contractor appeals or sues as provided in section 113 of this title, interest shall not accrue after the thirtieth day following the delivery of the findings on any amount allowed by such findings, unless such amount is increased upon such appeal or suit. In approving, ratifying, authorizing, or making termination settlements with subcontractors, each contracting agency shall allow interest on the termination claim of the subcontractor on the same basis and subject to the same conditions as are applicable to a prime contractor.

## (g) Amendment of contracts

Where any war contract does not provide for or provides against such fair compensation for its termination, the contracting agency, either before or after its termination, shall amend such war contract by agreement with the war contractor, or shall authorize, approve, or ratify an amendment of such war contract by the parties thereto, to provide for such fair compensation.

## CREDIT(S)

(July 1, 1944, c. 358, § 6, 58 Stat. 652; Ex. Ord. No. 9809, § 8, eff. Dec. 12, 1946, 11 F.R. 14281; 1947 Reorg.Plan No. 1, § 201, eff. July 1, 1947, 12 F.R. 4534, 61 Stat. 951; June 30, 1949, c. 288, Title I, § 102(b), 63 Stat. 380.)

41 U.S.C.A. § 106, 41 USCA § 106
Current through P.L. 116-68.

**End of Document**                                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                    5

United States Code Annotated
  Title 41. Public Contracts [Repealed]
    Chapter 2. Termination of War Contracts

This section has been updated. Click here for the updated version.

41 U.S.C.A. § 113

§ 113. Appeals

Effective: [See Text Amendments] to January 3, 2011

### (a) Failure to settle claims by agreement; preparation of findings; notice to war contractor

Whenever the contracting agency responsible for settling any termination claim has not settled the claim by agreement or has so settled only a part of the claim, (1) the contracting agency at any time may determine the amount due on such claim or such unsettled part, and prepare written findings indicating the basis of the determination, and deliver a copy of such findings to the war contractor, or (2) if the termination claim has been submitted in the manner and substantially the form prescribed under this chapter, the contracting agency, upon written demand by the war contractor for such findings, shall determine the amount due on the claim or unsettled part and prepare and deliver such findings to the war contractor within ninety days after the receipt by the agency of such demand. In preparing such findings, the contracting agency may require the war contractor to furnish such information and to submit to such audits as may be reasonably necessary for that purpose. Within thirty days after the delivery of any such findings, the contracting agency shall pay to the war contractor at least 90 per centum of the amount thereby determined to be due, after deducting the amount of any outstanding interim financing applicable thereto.

### (b) Rights of war contractor

Whenever any war contractor is aggrieved by the findings of a contracting agency on his claim or part thereof or by its failure to make such findings in accordance with subsection (a) of this section, he may bring suit against the United States for such claim or such part thereof, in the United States Court of Federal Claims or in a United States district court, in accordance with sections 1346, 2401, and 2402 of Title 28,

44

except that, if the contracting agency is the Reconstruction Finance Corporation, or any corporation organized pursuant to the Reconstruction Finance Corporation Act, or any corporation owned or controlled by the United States, the suit shall be brought against such corporation in any court of competent jurisdiction in accordance with existing law.

### (c) Procedure

Any proceeding under subsection (b) of this section shall be governed by the following conditions:

**(1)** When any contracting agency provides a procedure within the agency for protest against such findings or for other appeal therefrom by the war contractor, the war contractor, before proceeding under subsection (b) of this section, (i) in his discretion may resort to such procedure within the time specified in his contract or, if no time is specified, within thirty days after the delivery to him of the findings; and (ii) shall resort to such procedure for protest or other appeal to the extent required by the Administrator of General Services, but failure of the contracting agency to act on any such required protest or appeal within thirty days shall operate as a refusal by the agency to modify its findings. Any revision of the findings by the contracting agency, upon protest or appeal within the agency, shall be treated as the findings of the agency for the purpose of appeal or suit under subsection (b) of this section. Notwithstanding any contrary provision in any war contract, no war contractor shall be required to protest or appeal from such findings within the contracting agency except in accordance with this paragraph.

**(2)** A war contractor may initiate proceedings in accordance with subsection (b) of this section (i) within ninety days after delivery to him of the findings by the contracting agency, or (ii) in case of protests or appeal within the agency, within ninety days after the determination of such protest or appeal, or (iii) in case of failure to deliver such findings, within one year after his demand therefor. If he does not initiate such proceedings within the time specified, he shall be precluded thereafter from initiating any proceedings in accordance with subsection (b) of this section, and the findings of the contracting agency shall be final and conclusive, or if no findings were made, he shall be deemed to have waived such termination claim.

**(3)** Notwithstanding any contrary provision in any war contract, the court shall not be bound by the findings of the contracting agency, but shall treat such findings as

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

prima facie correct, and the burden shall be on the war contractor to establish that the amount due on his claim or part thereof exceeds the amount allowed by the findings of the contracting agency. Whenever the court finds that the war contractor failed to negotiate in good faith with the contracting agency for the settlement of his claim or part thereof before appeal or suit thereon, or failed to furnish to the agency any information reasonably requested by it regarding his termination claim or part thereof, or failed to prosecute diligently any protest or appeal required to be taken under subsection (c)(1)(ii) of this section, the court (i) may refuse to receive in evidence any information not submitted to the contracting agency; (ii) may deny interest on the claim or part thereof for such period as it deems proper; or (iii) may remand the case to the contracting agency for further proceedings upon such terms as the court may prescribe. Unless the case is remanded, the court shall enter the appropriate award or judgment on the basis of the law and facts, and may increase or decrease the amount allowed by the findings of the contracting agency.

**(4)** Any such proceedings shall not affect the authority of the contracting agency concerned to make a settlement of the termination claim, or any part thereof, by agreement with the war contractor at any time before such proceedings are concluded.

### (d) Omitted

### (e) Arbitration

The contracting agency responsible for settling any claim and the war contractor asserting the claim, by agreement, may submit all or any part of the termination claim to arbitration, without regard to the amount in dispute. Such arbitration proceedings shall be governed by the provisions of United States Arbitration Act to the same extent as if authorized by an effective agreement in writing between the Government and the war contractor. Any such arbitration award shall be final and conclusive upon the United States to the same extent as a settlement under subsection (c) of section 106 of this title, but shall not be subject to approval by any settlement review board.

### (f) Conclusiveness of decisions

Whenever any dispute exists between any war contractor and a subcontractor regarding any termination claim, either of them, by agreement with the other, may submit the dispute to a contracting agency for mediation or arbitration whenever authorized by the agency or required by the Administrator of General Services.

46

Any award or decision in such proceedings shall be final and conclusive as to the parties so submitting any such dispute and shall not be questioned by the United States in settling any related claim, in the absence of fraud or collusion.

## CREDIT(S)

(July 1, 1944, c. 358, § 13, 58 Stat. 660; Ex. Ord. No. 9809, § 8, eff. Dec. 12, 1946, 11 F.R. 14281; 1947 Reorg. Plan No. 1, § 201, eff. July 1, 1947, 12 F.R. 4534, 61 Stat. 951; June 30, 1949, c. 288, Title I, § 102(b), 63 Stat. 380; July 14, 1952, c. 739, §§ 1, 2, 66 Stat. 627; Apr. 2, 1982, Pub.L. 97-164, Title I, § 160(a)(14), 96 Stat. 48; Oct. 29, 1992, Pub.L. 102-572, Title IX, § 902(b)(1), 106 Stat. 4516.)

41 U.S.C.A. § 113, 41 USCA § 113
Current through P.L. 116-68.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   4